WALTON (MOORE v.). See Case No. 9,779.

---

## Case No. 17,135.

### WALTON et al. v. The NEPTUNE.

[1 Pet. Adm. 142.] 1 ·

District Court, D. Pennsylvania. 1800.

SEAMEN'S WAGES—DEATH ABROAD—SICKNESS RESULTING FROM SEAMAN'S FAULT.

1. The seamen shipped for the whole voyage of the Neptune, and died before her return to Philadelphia. Their administrators claimed wages until the return of the ship, which were allowed by the court.

[Cited in note to Scott v. Greenwich, Case No. 12,531.]

2. In the shipping articles used in the United States, though wages are designated by the month, yet the contract is entire for the voyage.

3. Freight is always the rule of wages.

4. Hiring a seaman in place of the one dead has no influence on the general principle.

5. Capture interrupt, or wreck destroy, the voyage.

6. What is meant by full wages.

7. If sickness arose from the fault or vice of the mariner, no wages would be allowed.

[Cited in Writer v. The Richmond, Case No. 18,101; The Ben Flint, Id. 1,299; The City of Alexandria, 17 Fed. 395.]

8. Full wages allowed at common law although the disability be by accident.

[9. Cited in U. S. v. New Bedford Bridge, Case No. 15,867, to the point that the laws of Oleron are yet in force, except as to some of their harsh punishments for crimes and offenses, which are out of use.]

[10. By act of congress, the ship is bound to furnish medicines or pay the physician's bill; but the sailor, when the ship is properly furnished, must pay for surgical or medical advice and assistance. If left or put on shore, his reasonable board wages must be paid by the ship.]

[Cited in Harden v. Gordin, Case No. 6,047; Freeman v. Baker, Id. 5,084; Holmes v. Hutchinson, Id. 6,039; The Forest, Id. 4,936; Richardson v. The Juillette, Id. 11,784; The Ben Flint, Id. 1,299.]

PETERS, District Judge. The mariners shipped at Philadelphia, the twenty-first day of December, one thousand seven hundred and ninety-nine, at the current monthly wages, to perform a voyage to the Havanna, and back to Philadelphia. They died, through accidental illness, of a prevailing fever at the Havanna, while in the service of the ship. The libellants [Walton, administrator of Strum, and Armstrong, administrator of Pagel] claim wages as due to the decedents, for the whole voyage, allowing funeral expenses and physicians' bills. The ship arrived at Philadelphia, and earned her freight. The owner

alleges, they should only be paid, pro tanto, to the time of their respective deaths.

The laws of Oleron contain the principles of all the maritime laws of the European western nations concerned in commerce; with some particular exceptions in particular cases. They are yet in force, and acknowledged in their great and leading principles, by all the trading nations; though some of their harsh and severe punishments and pecuniary mulcts, for crimes and offences, are out of use. Whenever any of their regulations are modified or contradicted, they are ·so modified or opposed by special ordinances, binding only in the particular state making them. Thus in France, by the thirteenth and fourteenth articles of the twenty-ninth section of the Ordinances of Louis the Fourteenth, it is declared, that "the heirs of a seaman hired by the month, and dying in the voyage, shall be paid his wages, until the day of his decease. The half of the wages of a seaman, hired by the voyage, shall be due to his heirs, if he dies outward bound; and the whole, if he dies in the way home. And if he sailed by the profit, or freight, his heirs shall enjoy his full share, if the voyage be begun before his death." Yet even in this modification, the leading principle is preserved, of payment of full wages, or freight; in the two latter cases, because the sailor was not in fault, but by an inevitable casualty, was prevented from fulfilling his contract. There is a similar distinction in the ordinances of Charles the Fifth, as to a sailor dying in the outward passage, when his heirs shall have half; and if on the home passage, they shall have his full wages. But in Spain, where their seamen are treated with peculiar strictness, there is a local custom, that "in ships of war on India voyages, if a man die the first day of the·voyage his heirs are to be paid as much as if he had completed it." Herein preserving the general principle on which I have dilated in the case of Hart v. The Littlejohn [Case No. 6,153]. In that case, and in this, I consider the contract to be for the voyage, though monthly wages are stipulated; to take from the mariner the risk of long, and to give to the owner the advantage of short, passages. The terms of the shipping articles prove this, and the forfeitures, incurred by desertion, go to the whole due the sailor, for the preceding part of the voyage, and not solely to the month in which the forfeitures attach.

I have always made freight the rule. In a former case in this court, wherein an attempt was made to cut the seamen out of their wages, for the whole of an East India voyage, by making them payable only on the ship's return to Philadelphia, I decreed wages as far as freight was earned, the vessel having been captured on the home passage. I did not then recollect a stronger case than that before me. 2 Vern. 727. The seventh article of the laws of Oleron is clear, in my view, to the present question. It makes no distinction between the out and home passage. In this

---

1 [Reported by Richard Peters, Jr., Esq.]

article, after declaring what shall be done with a mariner falling sick, and left on shore after the departure of the ship, it is ordained —"But if he recover he ought to have his full wages; deducting only such charges as the master has been at for him, (to wit, better diet than the ship afforded, or more provisions than he required on ship board), and if he dies, his wife or next of kin, shall have it," i. e. his full wages. The 59th article of the laws of Wisbuy, the 45th of the laws of the Hanse Towns, and the 56th of those of Philip the Second, which he compiled for the Low Countries, were all founded on this law of Oleron, and agree with it exactly, both if he recover his health or die in the voyage.— See note on the 7th article, Laws Oleron. In one of these laws, the expression is general "he shall be paid his wages, if he recover," which, if explained by the laws of Oleron, certainly means "his full wages." But in the other law, it is more clearly expressed, "he shall be paid his wages as much as if he had served out the whole voyage." And in the event of death, I have no doubt that the words "his heirs shall have what was due to him" mean, according to the laws of Oleron, on which this is founded, "his full wages," or according to the preceding part of this same article "his wages as much as if he had served out the whole voyage."

Thus, by these wise and politic regulations, making attention to mariners the interest, as it was the duty of masters of ships. They or their owners sustain a loss by the death, but profit (in his services, and saving of the hire of another in his room) by the continuance of health, or recovery of the mariner from sickness. Hereby also giving encouragement to those who enter into this hazardous and laborious employment. Some provision being, in this way, made for them if they survive, when lingering under convalescence, or ruined by disability, occasioned by sickness or accident; or for their families, in the event of their death. This benevolent principle has always been attended to by enlightened nations. It is established in the most respectable codes of jurisprudence, among the general and leading points of justice, in contracts for personal services of every description. Common law authorities can be produced in support of it: it is grounded in the wisdom of ages. We find it recognised in the Digest of Justinian (law 38, p. 58): "He who has hired his services is to receive his reward for the whole time, if it has not been his fault that the service has not been performed." The laws of the Rhodians are inserted in this Digest.[2] These are the most ancient sea laws extant. They were adopted for the most part by the Romans; and we see their principal features in the laws of Oleron. One of these laws (article 46, Rhodian Laws) directs "that if the ropes break and the boat goes adrift, with mariners in it, and they perish at sea, the master shall pay their heirs one full year's wages." This article has been held to be a mulct on the master for having bad ropes; but we see no such assertion, in the text of the article. It proves, at any rate, the early attention paid to the families of deceased mariners, by commercial nations.

The provisions of the general maritime laws, and the principles of the Roman, or civil law,

2 This fact I had taken from respectable authorities, and presumed it correct: although I knew it had been doubted by some, and contradicted by others. Among those who do not consider the parts of those laws now extant as genuine, is Bynkershoek, whose opinion has always great influence. A late writer (Azuni), who has treated with ability and extensive knowledge on maritime law, but is not free from prejudices on particular points, has taken much pains to prove, that the whole of the Rhodian laws were not inserted in the Digest of Justinian, though one of these laws relative to jetison, is to be found therein. He cites and comments on a number of authors for and against the authenticity of the fragments generally received as parts of the Rhodian laws; and concludes against their being genuine. He asserts, that these supposed Rhodian laws, are productions of more recent date, and fabricated by more modern Greeks. He brands them with the character of "trash"; yet, however accurate his opinions may be in other respects, I see not that they merit an appellation so vituperative. They contain many of the valuable principles of maritime law, though (as light things float long) some of the least important may have been borne down to us on the tide of time. It will be seen, on examining the authorities, many whereof are cited by Azuni (see 1 Mar. Laws [New York Ed. 1806] p. 265, et seq. and notes), that these fragments were discovered in Pithou's library, and first printed in Germany, by Simon Scardius. The Greek was the original language, in which these ancient laws were written. But Azuni discovers some modern Grecisms in Scardius' copy. The evidence, appearing on the face of them, of this language is, so far as it goes, rather a proof of authenticity; even if some corruptions from the purity of the original may have crept into, relatively, modern copies. Many ancient manuscripts and authentic classical works have been discovered in monasteries, where they have lain neglected for ages. Poggio, in the 15th century, recovered in Germany (where these fragments were found) as well as in Italy, some of the most valuable of the Roman classics, buried in rubbish and dust, in cloisters and other obscure places, where only one of his industry and talents would have sought for or found them. Pithou's library was a depositary more respectable: and Marquardus Freer and Leunclavius were the editors of the laws found there, and considered them authentic. They were persons of the first grade of literary character. The Pandects were discovered at Amalfi, or Pisa, (for this is not clearly ascertained) in places no more important to their credit, than the library of Pithou was to the Rhodian laws, said to be there deposited. Nor are those who attest the facts, as to the Amalfi or Pisan copy, or copies of the Pandects, more credible than Freer, or Leunclavius. The Pisans enobled M. Azuni for attributing to their predecessors the Consolato del Mare, and the discovery of the Pandects. It appears, however, be the fact of the authenticity of the Rhodian laws as it may (according to the allegation, after due examination, of the able American translator of Azuni's work, to whose labours and information I am much indebted) that the English compiler of the "Sea Laws," a book generally of good authority, is egregiously mistaken, when he asserts that, these fragments of the Rhodian laws are to be found in the Italian copy

I am bound to respect, when relevant to points before me, in my decisions on the admiralty side of this court. We have no act or ordinance of our own nation, comprehending the case in question. Having entered into the society of nations, we must therefore be regulated by the general laws which govern in maritime cases. I do not see that hiring a mariner in the place of the sick, disabled, or deceased seaman, (which is an obligation on the master, or he risks his insurance, or the safety of the ship) alters the principle of the case. It has

of the Pandects or Digest; and this copy has been most generally considered the only genuine remains of that important collection. It is nevertheless not incredible, that there were other copies of the compilations made by Justinian and his coadjutors, than those found at Amalfi or Pisa. This controversy has divided the learned for a long period; and must be left with those who delight in such investigations. Those who desire to gratify their curiosity, may consult 'Schomberg's Chronological View of the Roman Law,' where the subject of the Justinian Pandects, Code and Novels, and that of the Basilican Code, is concisely treated, and the authorities cited. It does not appear less probable that the Rhodian laws either entire, or digested, and published under one of the Greek emperors in their original language, were in existence in 876, in the time of the Emperor Basilicus, than that the Pandects should be found at Amalfi in 1135 or 1137. The Greek copy may have been preserved in Germany, and there discovered, as many such ancient manuscripts have been, in that district of the empire.

Having conceived and declared that, "the laws of the Rhodians are inserted in the Digest," I considered myself bound to give some account of the subject. But I have no desire to enter into an unnecessary critical investigation, or controversy, on a topic in which I may have been mistaken, and misled. I have fallen into an error, if such it really is, in common with many others. After all, this assertion is, beyond dispute substantially true. It is agreed on all hands, and conceded by Azuni himself, that the Rhodians gave the principles of maritime law to the Romans, who adopted them into their Code. Their leading character is allowed to be engrafted in the Roman, as well as subsequent sea laws. See Azuni on this subject. Whether the laws, in the very words in which they were originally promulgated, or only a summary of, or commentary on, them, "are inserted in the Pandects or Digest," is immaterial; if their general principles and distinguishing features are handed down to us. We have indisputable maritime laws, competent to guide and govern us, if what we have heretofore deemed the Rhodian laws should be rejected as apocryphal. The principles of the venerable Rhodian Code are indubitably transfused into systems yet extant, and in high estimation. These principles have survived the ravages of barbarism, and the vicissitudes of fortune, which have reduced to imbecility and obscurity, the once powerful and celebrated people, with whom they originated. Time, which has exterminated every monument of their wealth and splendor, has perpetuated these more durable memorials of their policy, wisdom and justice: by disseminating them through distant regions, and extending their inestimable advantages to remote generations and races of men.

[The following explanatory note relative to the Rhodian laws has been added by Judge Peters as a correction to the above note. It is reprinted from 2 Pet. Adm. 478:]

Not having considered it so important to establish (if I were capable of so doing) the au-

an effect on the profit of the merchant, always subject to chances; and the death or sickness of mariners, is among his other risks. But it is beside the question of law. This profit is as much diminished by hiring in the room of sick or disabled mariners, (and their number is of no import as to the principle) as of those dead. The Spaniards oblige a sick or disabled mariner, to pay for one hired in his stead. But this is reprobated by the writers of other nations, as a severity peculiar to Spain. The argument, applicable only to a mariner recovered from

thenticity of the Rhodian fragments, as to show that the principles of the Rhodian laws were inserted in the Digest of the Justinian, all the facts relative to these fragments were not sufficiently attended to. Nor were the compilations of Justinian then examined farther than occasional references required. It is alleged in the note that the fragments were first printed in Germany. It appears they were first printed at Basle in Swisserland, by Scardius, in 1561; and afterwards, in 1596 at Frankfort, in Germany, by Leunclavius and Marquardus Freer. They were Germans, and the latter was the pupil of the celebrated Cujas or Cujaccius, as was also Pierre Pithou or Pithoeus. In this note it is suggested, that the fragments were found in Germany. This does not appear clearly in any of the books I have had opportunities of consulting. The Pithous, Pierre and Francis, were brothers, and sons of an eminent civilian. They were Frenchmen; and the former most celebrated. He was a Protestant, and had a miraculous escape from the infamous massacre of St. Bartholomew. Both were consulted on great juridical and diplomatic questions, being eminently famed for their talents and accurate knowledge of the Roman laws; many valuable portions whereof (collected and preserved in their libraries) were by them "brought forth from the obscurity in which they had been buried for ages." Pierre was styled the Varro of France: his library was in Paris, and accounted the most valuable collection in his time. The Rhodian fragments were discovered in the library of Francis Pithou; which was also greatly valued, when public libraries were rare. In these fragments, as published by Scardius, Azuni discovers Latin words written with Greek letters. Such should have been styled "Latinisms." However the fact of authenticity may be, it appears the most probable, that the text of the Rhodian laws was not inserted in the Pandects: though it is asserted by respectable jurists (cited by Schomberg, Illustrations 199,) that the Romans, and after them the Greek emperors, "regulated all matters of trade and navigation by the Rhodian laws, which were, on that account, admitted into the Pandects." To admit them verbatim seems to have been inconsistent with the plan of these collections, which was to condense and abridge, and not exactly to copy the Roman or other laws, the principles whereof were adopted. This became the custom of jurists, not only of the period in which the Digest was formed, but of succeeding ages. It has not yet ceased, though it is condemned by writers of eminence, as a practice which has tended to supersede the use of the original laws; and thereby occasion their loss and final destruction. The Basilica or Procheiron of the Emperor Basil or Basilius is only an epitome of Justinian's Code, which has always been considered of the highest authority; and to form the most essential part of what is called "Corpus Juris Romano-Civilis," —a title applied, in its strict sense, solely to the Institutes, Code and Novels of Justinian. The use of the Basilica, encouraged by the Greek emperors, may have superseded that of the Roman Code; and occasioned its laying so long in obscurity.

sickness or disability, and left in a distant country, leaves the case where it finds it. These mariners are said to be entitled to their wages, only from the peculiarity of their situation, i. e. to enable them to get home; yet they do not receive them till they arrive at home: whither they most commonly work their passages; and if they do not, but receive wages, these are deducted from their demands. If the mariner had arrived in the ship, though from sickness or disability he had done no duty, his claim to his full wages, would be equally legal. The subject must be viewed on a more extensive scale, than as it affects the interests of individuals. I conceive it to be for the great and general interests of commerce, and much for its reputation, that, at some particular sacrifice of gain, encouragement and support should be afforded by those who profit by their services, or hire them with that object, where mariners are unfortunate and faultless. Occasions too frequently happen in which they merit, and incur, severe forfeitures and punishments.

Although the sum in demand in this case is small, the subject often presents itself; and I wish to put the point at rest here, until an occasion for an appeal offers. I must be guided by what I conceive fixed principles, which ought not to be shaken because temporary inconveniencies casually occur. I wish it to be understood, that, in the application of the general principles here I do not lose sight of the limitation mentioned in the case of The Littlejohn [supra]. All general rules are subject to exceptions. Capture or wreck interrupt or destroy the voyage. The sick mariner, or the heirs of one dead, can only receive wages out of the freight earned; and so far as it is earned. And in the case of a ship seized for debt, or forfeited through the owner's default, wages will be received though no freight be earned. By full wages I therefore mean, as much as he would have been entitled to, had he been on board and met the fate of the ship. In the case I have now to determine, the freight was earned for the voyage. So it was in the case of The Littlejohn, with the deduction of salvage—to which, if it had occurred here, I should have ordered the libellants to contribute. They must now allow all sums, lawfully chargeable against the decedents. Let it be also understood, that the sailor must not be in fault. If his sickness, disability or death is owing to vicious or unjustifiable conduct, he, or his heirs must bear the loss, propter delictum.

I have looked into several common law authorities on this subject. By the common law, no contract for wages was apportionable. Brooke, Abr. tit. "Apportionments; Labourers' Contracts." See the case of Chandler v. Greaves, H. Bl. 606. It appears expressly on enquiry, by order of the court of C. P. in 1796, into the usage of the British admiralty, a disabled mariner "was always entitled to his wages during the whole voyage." And in this case, full wages were recovered at common

law. The mariner's disability was occasioned by an accident, happening on board the ship, and he does not appear to have met it in doing actual duty. There is no difference as to wages, between the case of a sailor disabled on actual duty, or that of one taken sick, or, owing to no misconduct, accidentally disabled while in service. In the former case, he is to be cured at the expense of the ship; in the latter, at his own charge. The ship, by act of congress is bound to furnish medicines or pay the physician's bill: [3] but the sailor, when the ship is so furnished, must pay for chirugical or medical advice and assistance. If left or put on shore (in lieu of the ship's provisions, ship-boy, or nurse ordered by the law of Oleron) his reasonable board wages must be paid by the ship. The case in 6 Term R. 320 (Cutter v. Powell), was determined on the special agreement, and not on the general maritime law. A sum in gross, four times larger than the rate of current wages, was to be paid on terms which death prevented the mariner from performing. "Modus et conventio vincunt legem." It appears in this case, that there was no fixed usage among the London merchants, in 1795, on this subject. The high wages given to our mariners, are general, and not confined to a particular case; they are contracted for under the shipping articles, and not by special agreement. They are caused by our neutral situation, which occasions great demands for seamen. The merchant's profit, or chance of it, is in proportion. High wages, are however, not confined to the maritime class of our citizens. But the principle is not affected by such fluctuating circumstances. It is certain that I rely much on principles practised upon, in instances of sick and disabled mariners. I cannot distinguish these from those which should govern in the case of a mariner deceased. The law of Oleron couples them together, and is with me decisive. The ordinance of France has fixed a rule for that nation. This rule would give the libellants the full wages, if the decedents had died on the home passage. There are some grounds in point of fact, to warrant this application of their case to this rule, if it were necessary. The outward pas-

---

[3] Always bound to submit, with the respect I owe, to the laws, yet having frequently seen the inefficacy, and in several instances the danger, of medicines administered ignorantly, or carelessly, I have not been perfectly satisfied that the seamen should pay the bill for medical advice, which to complete the intent of the provision should be charges on the ship. But finding the weight of authority that way, I have yielded. It is certain that medicines administered without due knowledge of the disease, are as often fatal as the malady, if not more so. Congress intended a benefit to the mariner, but he had better pay for medical advice, than risk the consequences of indiscreet use of the medicine chest. In numerous instances, physicians' bills, especially in the West Indies, have balanced the claim for wages. By the terms in the alternative, in the act of congress, that if the ship has no medicine chest, the owners shall pay the physician's bill, it seems, that if the ship is furnished with the chest, the sailor must pay for advice; but the ship must supply medicine.

sage was ended when the ship arrived at the Havanna. The wages for the voyage must be paid, subject to all legal deductions.

I do therefore adjudge, order and decree, that the libellants, respectively, have and recover the sums following, that is to say, Elijah Walton, administrator of Matthias Strum, shall have and recover the sum of one hundred and thirty dollars, and Andrew Armstrong, administrator of Johannes Pagel, shall have and recover the sum of sixty-four dollars and eighty-three cents, being the balance of wages due to the said Matthias Strum and Johannes Pagel, for the whole voyage. And I finally adjudge, order and decree, that the said ship Neptune, together with her tackle, apparel and furniture, or so much thereof as may be necessary, be condemned, and that the same be sold by the marshal of this district for the payment to the libellants aforesaid of the sums of money herein before decreed to them respectively, together with the costs and charges, legally accruing, in the premises.