### THE CITY OF ALEXANDRIA.

*(District Court, S. D. New York.   July 3, 1883.)*

1. ADMIRALTY—SEAMEN—PERSONAL INJURIES—MARITIME LAW.
   A claim by a seaman to recover damages for personal injuries from a fall on board ship upon the high seas, through the negligence of others of the ship's company, is governed by the rules of the maritime law, rather than of the municipal law, and the analogies of the latter are not necessarily applicable to the former.

2. SAME—NAVIGATION OF SHIP.
   The navigation of a ship constitutes one common employment, for which all the ship's company are employed.   Neither the vessel nor her owners, therefore, would be liable, according to the principles of the municipal law, for injuries happening to a seaman through the negligence of any of his associates in the performance of their ordinary duties.

3. SAME—SHIP LIABLE FOR EXPENSE OF NURSING AND MEDICAL ATTENDANCE.
   By the maritime law, ancient and modern, a seaman, in case of any accident received in the service of the ship, is entitled to medical care, nursing, and attendance, and to cure, so far as cure is possible, at the expense of the ship, and to wages to the end of the voyage, and no more.

4. SAME—EFFECT OF NEGLIGENCE.
   This right of the seaman is without reference to any question of ordinary negligence of himself or his associates, and is neither increased nor diminished by the one or the other.

5. SAME—GROSS MISCONDUCT.
   The only qualification arises from the willful and gross misconduct of himself or associates of the wrong-doer, in which case the expense may be charged against the wages of the wrong-doer.

6. SAME—CONSEQUENTIAL INJURIES.
   If after the seaman is wounded the officers of the vessel neglect to furnish proper treatment, *semble*, the vessel may be held for consequential injuries.

7. SAME—CLAIM OF EXCESSIVE DAMAGES—LIBEL DISMISSED.
   Where the libelant, the cook, went down the fore hatch in the morning before light, by the direction of the steward, and was not sufficiently notified of the half-open hatch below, and in consequence fell through and was injured, and was subsequently treated and cared for at the ship's expense, and received his wages to the end of the voyage, and thereafter filed this libel to recover $10,000 for permanent injuries, *held*, that the libel should be dismissed.

In Admiralty.

*James Flynn*, for libelant.

*A. O. Salter* and *R. D. Benedict*, for claimants.

BROWN, J.   The libel in this case was filed to recover $10,000 damages for personal injuries received on board the steam-ship City of Alexandria in falling through the fore hatch between-decks into the hold, on the twenty-fourth of November, 1879.   The libelant was the chief cook on the steamer, on a voyage from New York to Vera Cruz by way of Havana.   One of the persons on board having died, the cook was told, on the evening of November 23d, to go to the ice closets on the following morning and superintend the packing of the body in ice.   On the 24th he was called, a little after 4 A. M., by the steward, and told that the men were waiting for him below.   He was ordered by the steward to go down by way of the fore hatch, which was open.   A permanent perpendicular ladder ran from the

forepart of the hatch to the forepart of the hatch opening immediately below it. As the libelant went down this ladder, as directed, the steward testifies that he told him "to look out," or "to look out for the hatch;" he is not quite certain which. Two men had previously gone down in the same way, and had a light between-decks; but the light, at the time the libelant went down the ladder, had been placed behind a skid having a solid bottom, so that the hatch was in the shadow. The libelant testified that it was dark, and that he could not see as he went down. After reaching the foot of the ladder he carefully felt at the bottom with his feet, and finding good footing started to go towards the starboard side of the ship, and immediately fell through the hatch into the hold below, and received considerable personal injury. He was cared for at the expense of the ship, and his wages paid to the end of the voyage. He now sues for additional compensation for his permanent injuries and consequential damages, on the ground of the negligence of the officers of the ship in leaving the hatch open through which he fell, as well as for negligence in sending him below in the darkness without proper notice of the open hatch beneath.

The claimants contend—*First*, that there was no negligence on the part of the officers or the steward of the ship; and, *second*, that if there was, neither the ship nor her owners are responsible for consequential damages, either by the maritime law or by the common law, as the negligence, if any, arose from the acts of co-employes in the same employment or undertaking.

1. The evidence in regard to the notice or caution given to the libelant as he went down the ladder is conflicting. The libelant denies that any caution whatever was given to him, or any light offered. As chief cook he had charge of the ice-house, and was the proper person to superintend the packing of the body in ice. He was accustomed to go to the ice-house through the forecastle, and not through the fore hatch, which, at sea, was usually closed. On the day previous the steamer had touched at an intermediate port, and landed some cargo through the hatches; and on the day following she was expected to arrive at her port of discharge. In the fore hatch between-decks a piece of machinery was left sticking up, and the cover of the hatch, it appears, was placed over the port side of the hatch up to the projecting piece of machinery, and covered the part of the hatch at the foot of the ladder, but left an open space on the starboard side, through which the libelant fell. The cook had ordinarily nothing to do with the hatches, and was not aware that the hatch below was partly uncovered. The men who had descended before were cautioned, and also had a light with them, as above stated. Considering the emphatic testimony of the libelant, that he received no notice whatever, in connection with his fall, I think it probable that the steward is mistaken as respects his caution to the libelant, confounding it, perhaps, with the notice previously given to the other

men, or at least that his caution to the libelant was not sufficiently explicit to apprise him of the danger from the half-open hatch below; such as ought to have been given to one who was not accustomed to go down to the ice-closets in that manner.

2. Assuming, therefore, that there was negligence in the steward in ordering the libelant to go through the hatch without suitable notice of the danger below, the negligence was, nevertheless, that of an em-. ploye or fellow-workman in the same general undertaking or employment, for which, upon the well-settled principles of the municipal law, neither the vessel nor her owners would be liable. Whatever negligence there was,—whether in leaving the hatches uncovered, or in not notifying the libelant as he went down,—was negligence on the part of those on board the ship, and in no way traceable to the owners themselves. It was neglect of the officers or men aboard in the performance of their ordinary duties; a neglect against which the owners could not possibly guard. Those who engage in a common employment take upon themselves all the natural and ordinary risks and perils incident to the performance of their duties. Among these are the perils arising from the carelessness or negligence of others who are engaged in the same employment; and it constitutes no exception to the rule that the several persons employed are not in equal station or authority, or that one servant is injured through the negligence of another, who is his superior in station, to whom he owes obedience. *Hough* v. *Ry. Co.* 100 U. S. 213; *Wilson* v. *Merry*, L. R. 1 Sc. & Div. App. 326; *Allen* v. *New Gas Co.* 1 Exch. Div. 251; *Malone* v. *Hathaway*, 64 N. Y. 5, 9; *Fuller* v. *Jewett*, 80 N. Y. 46.

The navigation of a ship from one port to another constitutes one common undertaking or employment, for which all the ship's company in their several stations are alike employed. Each is in some way essential to the other, in furtherance of the common object, viz., the prosecution of the voyage. Each one, therefore, upon the principles laid down in the common-law courts, takes the risk of any negligence in the performance of his duties by any of his associates in the common employment; and on common-law principles, therefore, the libelant's claim could not be sustained.

3. This claim, however, is brought in a court of admiralty by a libel *in rem* against the vessel; and in such a case the question is not properly whether the analogies of the municipal law would or would not sustain such an action, but whether by the maritime law a lien exists upon the vessel for such a claim. The libelant's employment was a maritime contract; the injury for which compensation is claimed arose upon the high seas. The true question, therefore, is, whether the negligence through which the accident happened entitles the libelant, by any recognized principles of maritime law, to compensation from the ship or her owners beyond that which he has already received. The facts do not present the question, to what extent the owners might be liable in damages for any actual negligence of their

own, or of others in their employ, in the proper outfit or equipment of the vessel, or for her unseaworthy condition when sent out of port; for no negligence or insufficiency in these respects appears. The question here relates exclusively to their responsibility for injuries through the alleged remissness of some of the ship's company in the performance of their respective duties on board, and in the course of their ordinary employment.

The liability of seamen to injuries of this kind is as old as navigation, and multitudes of essentially similar cases must have occurred almost every year from time immemorial. It would seem to be incredible, therefore, that the sea-laws, ancient and modern, should not have indicated the extent of the liability of the vessel or her owners for such injuries. The obligations of the vessel and her owners have, in fact, been defined in nearly the same language in both the ancient and modern authorities. By article 6 of the Laws of Oleron it is provided: "If by the master's orders and commands any of the ship's company be in the service of the ship, and thereby happen to be wounded or otherwise hurt, in that case they shall be cured and provided for at the costs and charges of the said ship." Similar is section 18 of the Laws of Wisbuy; and by article 39 of the Laws of the Hanse Towns it is provided: "If any seaman is wounded in the ship's service, he shall be cured at the charge of the ship; but not if he is wounded otherwise."

In Curt. Rights & Duties of Seamen, 109, 110, it is said:

"The seaman is entitled to be cured of all sickness or injuries occurring while in the ship's service." "All that the rule requires is that the sickness or injury should not be occasioned by his own fault." "The rule is limited to the cure of the sickness or injuries, and does not include any compensation or allowance for the effects of the injury."

In none of the sea laws, or in the recognized authorities on maritime law, is there any indication of liability of the ship or her owners for such hurts or injuries beyond the expenses of the care, attendance, and cure of the seaman.

In *Reed* v. *Canfield*, 1 Sumn. 195, 202, the limit of the ship's liability in such cases was considered by STORY, J., in which he says:

"The law embodies in its very formulary the limits of the liability. The seaman is to be cured, at the expense of the ship, of the sickness or injury sustained in the ship's service. It must be sustained by the party while in the ship's service, and he is not to receive any compensation or allowance for the effects of the injury. But so far, and so far only, as expenses are incurred in the cure, whether they are of a medical or other nature, for diet, lodging, nursing, or other assistance, they are a charge on, and to be borne by, the ship. The sickness or other injury may occasion a temporary or permanent disability; but that is not a ground for indemnity from the owners. They are liable only for expenses necessarily incurred for the cure, and when the cure is completed—at least, so far as the ordinary medical means extend—the owners are freed from all further liability."

In the case of *The Atlantic*, Abb. Adm. 451, where a sailor had been hurt by a fall from the main topsail yard, the limit of the ship's liability again came under the careful consideration of BETTS, J. The general rule is there stated by him that the mariner is entitled to be cured of sickness and wounds received in the service of the ship. The word "cured," he says, is not to be taken in an absolute sense:

"That would involve impossibilities. Diseases and injuries so incurred are frequently in their nature, and in their direct consequences, incurable. An exposure to unusual labor or privations on the voyage may induce maladies permanent or irremediable in their character. Thus broken limbs or bodily debility, resulting from services in the ship, are very often the sailor's heritage for the residue of his life."

He refers to the discussion of the subject by STORY, J., in the case of *Reed* v. *Canfield, supra*, and concurs therewith so far as it goes, adding that the case did not determine whether the cure required during the voyage is to be continued after its termination. After referring to the provisions of various codes, he says:

"The term 'cure' was probably employed originally in the sense of *taking charge* or *care of* the disabled seamen, and not in that of positive *healing.* The obligation of the ship to the mariner would then be co-extensive in duration with that of the mariner to the ship. Natural reason would seem to point to that limitation, it being the one consonant to the relation in which the law places the parties to each other, and by which it measures their privileges and liabilities under a shipping contract.

"This rule may undoubtedly be subject to variations. When a course of medical treatment, necessary and appropriate to the cure of the seaman, has been commenced, and is in a course of favorable termination, there would be an impressive propriety in holding the ship chargeable with its completion; at least, for a reasonable time after the voyage is ended or the mariner is at home. So, also, in case due attention to his necessities has been unjustly omitted by the ship abroad, or his case has been improperly treated, the courts may properly enforce against the ship this great duty towards disabled mariners, even after her contracts are terminated, upon the ground of a failure to perform towards them the obligation in the shipping contract. See *Brown* v. *Overton*, 1 Spr. 462. These particulars, however, are not stated as ingredients in the present case, but are referred to in illustration of the doctrine involved in some of the authorities, and to show they are not inconsistent with the general principle that a seaman has no claim upon the ship or her owner for the cure of his sickness or disabilities after his contract has terminated, and he is returned to his port of shipment or discharge, or has been furnished with means to do so."

Two years previously the same general subject had come before Judge BETTS in the case of *Nevitt* v. *Clarke*, Olc. 316, where he examined, with his accustomed learning, the question of the continuance of the liability of the ship in case the injured seaman's cure was incomplete at the end of the voyage, and held that the ship's responsibility ended with the voyage.

In the case of *The Ben Flint*, 1 Abb. (U. S.) 126, the same subject is reviewed by Mr. Justice MILLER, and the conclusion arrived

at that, in the absence of misconduct or neglect on the part of the officers, the obligation of the vessel ends with the voyage.

In the cases above cited, it is true, the claim was only for expenses of sickness or cure, or claims for wages during the period of illness, and not directly a claim for compensation for injuries resulting from the negligence of others on board the ship; but the provisions of the various codes, ancient and modern, and the decisions in the reported cases, obviously proceed without reference to the question whether the hurts received by the seamen were received by what might be called mere accident, or through any remissness or ordinary negligence, either of himself or of any others of the ship's company, in the performance of their accustomed duties. The only recognized qualification of the seamen's right of recovery is where the injuries have arisen from his own gross and willful misconduct, (*The Neptune*, 1 Pet. Adm. 142; *The Ben Flint*, *supra*,) in which case, and also if the injury arose from the willful wrong of another, the expenses to which the ship is put may be deducted from the wrong-doer. Laws of Oleron, § 6; Wisbuy, § 18; 1 Malloy, 351.

Misconduct or neglect by the officers in the treatment of the seaman, after he has been wounded in the service of the ship, becomes a different and additional cause of action against the ship, because a legal obligation to him then arises to afford suitable care and nursing; and if this be neglected the ship may be held to consequential damages. *Brown* v. *Overton*, 1 Spr. 462; *Croucher* v. *Oakman*, 3 Allen, 185; *Mosely* v. *Scott*, 14 Amer. Law Reg. 599. Beyond this I find no authority in the ancient or modern codes, in the recognized textbooks, or the decisions on maritime law, for the allowance of consequential damages resulting from wounds or hurts received on board ship, whether arising from ordinary negligence of the seaman himself, or of others of the ship's company. Considering the frequency of such accidents, and the lasting injuries arising from them in so many cases, the absence of any authority holding the vessel liable, beyond what has been stated, is evidence of the strongest character that no further liability under the maritime law exists.

The law pertaining to seamen is, in many respects, essentially different from that relating to employment on land. This has arisen necessarily from the peculiar circumstances of service at sea, and rests partly upon the ancient customary law, and partly upon numerous statutory provisions. Together they constitute a body of maritime law, according to the recognized authority of which the liability of ship-owners must be judged. On this subject, in the case of *Reed* v. *Canfield*, *supra*, Judge STORY remarks:

"It has been suggested that a seaman at home cannot be entitled to any claim against the owners of the ship for injuries received in the ship's service, any more than a mechanic or manufacturer at home for like injuries in the service of his employer. If the maritime law were the same in all respects with the common law, and if the rights and duties of seamen were

measured in the same manner as those of mechanics and manufacturers at home, doubtless the cases would furnish a strong analogy.    But the truth is that the maritime law furnishes entirely different doctrines upon this, as well as many other subjects, from the common law.  Seamen are in some sort co-adventurers upon the voyage, and lose their wages upon casualties which do not affect artisans at home.  They share the fate of the ship in cases of ship-wreck and capture.  They are liable to different rules of discipline and sufferings from landsmen.  The policy of the maritime law, for great and wise and benevolent purposes, has built up peculiar rights, privileges, duties, and liabilities in the sea service which do not belong to home pursuits.  The law of the ocean may be said in some sort to be a universal law, gathering up and binding together what is deemed most useful for the general intercourse and navigation and trade of all nations.  Whoever heard of salvage being allowed for saving property on land?  Whoever heard of any civilized nation which denied it for salvage services at sea, or on the sea-coast?  It is impossible, therefore, with any degree of security to reason from the doctrines of the mere municipal code in relation to purely home pursuits, to those more enlarged principles which guide and control the administration of the maritime law."

In cases of accidents like the present, the provisions of the maritime law applicable to the rights of the parties, are altogether different from those of the municipal law in regard to similar accidents on land.   By the latter, the person injured, if chargeable with contributory negligence, would recover nothing; he would not be entitled to wages while disabled, nor to be nursed and tended at his employer's charge.   By the maritime law, the mere ordinary negligence of the seaman, though that be the sole cause of the accident, makes no difference in his right to be cured at the ship's expense, and to his wages to the end of the voyage.   And as his own negligence does not debar him from these rights by the maritime law, so, conversely, these rights are in no way extended, though his hurts have arisen by the negligent acts of others of the ship's company.   In effect, the maritime law makes no account of mere ordinary negligence in such cases.   More or less negligence is in fact to be expected, and the rules long established, as regards the relief to be afforded, are irrespective of such negligence, whether by the seaman or others.   When the owners perform all that can be reasonably done on their part by the proper equipment of the vessel for the voyage, and the selection of competent officers and a sufficient crew, no reason exists in natural justice for holding them or their vessel answerable for the accidents to seamen which happen during the voyage, beyond the limits which the maritime law has established.   In this case there is no charge of any remissness on the part of the owners, and the injury arose from causes in no way under their control.   There is no ground in reason, therefore, for holding them or the vessel liable; and the maritime law affords no sanction for any claim to compensation beyond that already received by the libelant, in due medical care and treatment, and wages to the end of the voyage.

The cases of *The Chandos*, 4 FED. REP. 645, 651; *The Marcella*, 1

Woods, 302; *The D. S. Cage*, Id. 401; *Thompson* v. *Hermann*, 47 Wis. 602, [S. C. 3 N. W. Rep. 579,] cited by the libelant's counsel, though containing some expressions based upon the municipal law apparently favorable to the libelant's claim, are in no way in conflict with the conclusion to which I have arrived upon the facts in the present case.

The libel is dismissed, with costs.