## THE WESTPORT.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1905.)

### No. 1,115.

SHIPPING—INJURIES TO SEAMEN—NEGLIGENCE OF MASTER—FELLOW SERVANTS.

Libelant was injured by the breaking of the capstan of a vessel while it was being used to heave the vessel carrying a deck load of lumber alongside a wharf at low tide. The master superintended the navigation of the vessel from the bridge, and libelant alleged that the negligence consisted in the master giving orders to take additional turns of a hawser around the capstan, instead of requiring the hawser to be removed to the bitts of the vessel provided for such maneuvers. *Held*, that the negligence of the captain in giving such orders, if any, was in the ordinary navigation of the vessel, in which he was libelant's fellow servant.

[Ed. Note.—Who are fellow servants, see notes to Northern Pac. R. Co. v. Smith, 8 C. C. A. 668; Flippin v. Kimball, 31 C. C. A. 286.]

Appeal from the District Court of the United States for the Northern District of California.

For opinion below, see 131 Fed. 815.

Goodfellow & Eells and C. H. Wilson, for appellants.
F. R. Wall, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.    This was a libel in rem against the American steamer Westport to recover damages for serious personal injuries sustained by the libelant upon the breaking and carrying away of the capstan of the steamer while he was serving as a seaman on board of her.    The libel alleges that while the Westport was being warped alongside of the wharf at San Pedro, Los Angeles county, Cal., her master gave the libelant orders to take additional turns of the hawser around the capstan, and that libelant took two such additional turns as ordered, and that as he was about to leave the capstan it broke and carried away, "because said capstan was unsafe, unsound, insufficient, and unfit for the purpose for which at said time it was being used; that the master and owners of said vessel had knowledge of the unsafe, unsound, insufficient, and unfit condition of said capstan, and that this libelant had no such knowledge"; that by the breaking and carrying away of the capstan the libelant was very seriously injured, in particulars specified in the libel.    The libel further alleges that the libelant was, "through the negligence of the master and of the officers of said steamer, placed in a dangerous position, and was, in the manner already described, seriously crippled and maimed."    It is further alleged therein that all of the injuries received by the libelant were received without any fault or negligence on his part, and that they were caused wholly by the negligence of the owners and master of the vessel.    The claimants filed their claim, and made answer to the libel, in which, among other things, they denied that while the steamer was being warped alongside the wharf her master gave the libelant orders to take additional turns around the capstan, and denied that the libelant took two or any number of additional turns around it, and, while admitting that the capstan broke and carried away, denied that such breaking and carrying away was because it was unsafe, unsound, insufficient, or unfit for the purpose for which at any time it was being used.    The answer also denied that the master or owners of the steamer had any knowledge of the unsafe, unsound, insufficient, or unfit condition of the capstan, but admitted that the libelant had no such knowledge.    The answer also put in issue the alleged negligence on the part of the master and owners of the steamer in question, and alleged that the injuries sustained by the libelant were occasioned by his own neglect to obey the proper orders of the master, or by the neglect of his fellow servants.    The case came on for trial on testimony previously taken before a commissioner, and on testimony offered in open court, and resulted in a decree in favor of the libelant and against the claimants (who are the appellants here) for the sum of $4,500.

The case shows that the steamer in question arrived at San Pedro with a deck load of lumber, stacked about 12 or 13 feet high.    When

she arrived the tide was low, and the master had difficulty in bringing her alongside the wharf. For that purpose he caused a hawser to be carried from the stern of the vessel and made fast to the wharf, and, by alternately backing and starting forward her engines, endeavored to bring the steamer alongside the wharf. As the vessel rested, in part at least, upon the mud, that was a matter of some difficulty. The master directed the operations from his place on the bridge. The libelant and other members of her crew were on the deck of the stern of the vessel, behind the lumber, and neither they nor the capstan was within view of the captain. The second mate of the vessel stood on the lumber, immediately above libelant and the other seamen, for the purpose of transmitting the orders of the captain. The hawser running to the wharf from the vessel had been made fast to the vessel's bitts. The backward and forward motion of the vessel had slackened the hawser, and the captain ordered the men to take the hawser to the capstan and take in the slack. It is contended by the appellants that, after the slack had been so hauled in, the master ordered the libelant and the other seamen working with him to remove the hawser from the capstan and make it fast to the bitts. This order is disputed by the libelant, who claims that the order was that additional turns of the hawser be taken around the capstan. After a sufficient interval to perform either of these orders had elapsed, the master signaled the engineer to start the engines ahead, then stop the engines and put them full speed astern, by which such a strain was put upon the hawser that the capstan carried away, causing the injuries to the libelant complained of.

Upon certain points the evidence is without conflict. It is undisputed that the hawser was not removed from the capstan to the bitts after the slack had been taken in; it is undisputed that the strain put upon the hawser by the backing of the vessel carried the capstan away and inflicted the injuries complained of; and it is undisputed that the function of the capstan was not the bearing of any such strain, but that its office was the hauling in of the slack of a line, or other like service; that it is but a small affair, operated by handles at the side, and which, by its revolutions, winds up a rope or chain where the strain is not great. It is also a fact that the record contains no evidence that the capstan in question was unsafe, insufficient, or unfit for any service for which it was intended; but, on the contrary, shows, without conflict, that the libelant, with the other seamen working with him, had, by means of this capstan, drawn in the slack of this particular hawser, for which the hawser had been, by the master's order, transferred from the bitts to the capstan. For heavy strains, such as the warping or pulling of a vessel, the bitts are provided; and such is the undisputed evidence in the present record. It is not claimed that the bitts of this vessel were insufficient for that purpose. In so far, therefore, as the equipment of the steamer is concerned, it is impossible to see where her owners were negligent. Nor is it claimed that the officers of the vessel were in any respect incompetent. Nor does the evidence show that the place where the libelant was injured was unsafe, except in so far as the improper use of the capstan for the pulling of the vessel out of the mud and alongside of the wharf made it so. The whole case, therefore, turns upon the improper use of the capstan for that purpose. As has been said, the

evidence is without conflict that in the warping operation the hawser was first made fast to the bitts, and that in the backward and forward motion of the vessel the hawser had slackened, for which reason the master ordered the hawser transferred from the bitts to the capstan, and the slack taken in, which was done. At this point the conflict arises.

Upon the part of the claimants it is contended that, before any strain was put upon the hawser by backing the steamer, the master ordered the hawser taken from the capstan and made fast to the bitts; and it is insisted on their behalf that if that order had been obeyed the accident would not have occurred, and that therefore the proximate cause of the injury received by the libelant was the disobedience of that order by himself and the other seamen. The libelant testified that, after the slack was taken in, the captain ordered him and the other seamen working with him to make the hawser "good and fast, and take more turns, because the line was slack around the capstan, so we obeyed orders and went over and started to take some more turns. At the time we were working there with the turns, the capstan carried away and struck me." In this respect the libelant was corroborated by the testimony of two of the other sailors. Capt. Seel, characterized by the court below as "an intelligent and apparently disinterested witness," testified, in behalf of the claimants, that the order actually given by the master was to "heave tight and make fast to the bitts." In speaking of the order as testified to by Capt. Seel, the court below said:

"This certainly was not an absolute command to take the hawser from the capstan and make it fast to the bitts. But assuming that the last order given was to the effect that the hawser should be removed from the capstan and made fast to the bitts, it was negligence upon the part of the master, with his knowledge of the defective condition of the capstan, to put a strain upon the hawser without knowing that his order had been conveyed to the men and obeyed. The hawser had been taken to the capstan by the direction of the master, and the place where the libelant was working thus rendered unsafe in the event that any strain should be placed upon the hawser while it was on the capstan. Under such circumstances it was the duty of the master to have ascertained, before he backed the steamer, that his orders had been executed, thus making it safe for the libelant to remain in the place where he was working. The owners of the steamer owed to the libelant the positive duty of providing him a safe place in which to work, and they are responsible for the failure of the master to discharge it. For these reasons, and also because, upon consideration of all the evidence, I believe the allegations of the libel as to the manner and cause of the accident are sustained, a decree must be entered in favor of the libelant."

As has already been said, there was no evidence that the place where the libelant was hurt was unsafe, unless the improper use of the capstan, for the purpose of hauling the vessel from the mud alongside the wharf, made it so. And if it be true that the master did undertake to accomplish that result by means of the capstan, as testified by the libelant and by two of the other sailors, while it would show gross negligence upon the part of the master, it would be the negligence of a fellow servant of the libelant, for which the owner would not be liable. The case of Olson v. Oregon Coal & Navigation Company, 104 Fed. 574, 44 C. C. A. 51, was a libel for damages for personal injuries sustained by the libelant in a fall through an open hatchway on the deck of the steamer

Empire, on which he was employed in the capacity of ship carpenter. It was alleged, among other things, that on the voyage of the steamer from San Francisco to Coos Bay, in the state of Oregon, she had no cargo on board, and was, by reason of that fact, "liable to sudden, unusual, and violent motions when in waters agitated by the winds"; that at the time of her departure the bar of the harbor of San Francisco was breaking badly, and that, although there were covers on board the vessel for the hatches, the ship crossed the bar with her after hatch open, thereby making the deck of the steamer unsafe and dangerous; and that while the libelant was performing his duty upon the steamer as ship carpenter, in going from the after part of the vessel to the forward part, he, without any fault on his part, was thrown from his feet by a roll of the steamer, and, by reason of the after hatch being uncovered, he was thrown down that hatch, and fell a distance of about 30 feet onto the shaft alley of the steamer, and thereby sustained very serious and permanent injuries. This court, in considering the case, said:

"As the defendant is alleged to be a corporation, it is, of course, obvious that it could only operate the ship through its agents or servants, so that the negligence with which it is charged must necessarily have been the personal negligence of some one employed by it. Assuming, therefore, that the mere leaving open of the hatch, under the circumstances stated, can be properly held to have been negligence, it must necessarily have been the negligence of some officer or member of the crew of the ship. Assuming, further (for it is not so alleged), that it was the negligence of the captain, it was no more than negligence in the ordinary navigation of the ship, in which common employment all of the members of the ship's company were engaged. In matters of that kind the maritime law makes no account of mere ordinary negligence. In Quinn v. Lighterage Co. (C. C.) 23 Fed. 363, the negligence by which the libelant was injured was the immediate act of the master of the ship, namely, his premature order in setting the winch in motion. In that case the owners were held not liable, because that act was not one that the captain had done in his character as the representative of the owners, but was an act that any other co-servant in the same employment might have performed. 'The true inquiry,' said Judge Wallace, 'is whether the character of the act of the captain was one which it was incumbent upon the defendant [the owners] to see properly performed.' The owner, who is usually ashore, and in this case was a corporation, cannot, in the nature of things, see to the details of navigation. The officers and crew are employed for that purpose, and it would be quite as reasonable to hold the owner responsible for the negligent handling of a rope or sail as for the failure to close a hatch. It is undoubtedly true that the master represents the owner in respect to the personal duties and obligations which the latter owes to the seamen, such, for instance, as the maintenance of the ship and her apparel in a safe and seaworthy condition, procuring repairs and supplies, the supplying of the crew with sufficient food, and with medical attendance and care in case of injury or sickness, and for his neglect in any of those particulars the owner is liable. The cases of Gabrielson v. Waydell (C. C.) 67 Fed. 342; The A. Heaton (C. C.) 43 Fed. 592; Anderson v. The Rence (D. C.) 14 Sawy. 476, 46 Fed. 805; and The Chandos (D. C.) 6 Sawy. 546, 4 Fed. 645—were cases of that character. 'The navigation of a ship from one port to another constitutes,' as said by Judge Brown in The City of Alexandria (D. C.) 17 Fed. 390, 'one common undertaking or employment, for which all the ship's company, in their several stations, are alike employed. Each is in some way essential to the other in furtherance of the common object, viz., the prosecution of the voyage.' It is very clear that upon common-law principles the owner would not be liable for an injury sustained by one of such employés by reason of the negligence of one of his co-employés, whatever his grade in the common employment. In the recent case of Railroad Co. v. Conroy, 175 U. S. 323, 20 Sup. Ct. 85, 44 L. Ed. 181, where the case of Railroad Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, 28

L. Ed. 787, was finally and squarely overruled, the Supreme Court announces the true rule to be, both upon principle and authority, 'that the employer is not liable for an injury to one employé occasioned by the negligence of another engaged in the same general undertaking; that it is not necessary that the servants should be engaged in the same operation or particular work; that it is enough to bring the case within the general rule of exemption if they are in the employment of the same master, engaged in the same common enterprise, both employed to perform duties tending to accomplish the same general purposes; or, in other words, if the services of each in his particular sphere or department are directed to the accomplishment of the same general end.' It is true that the present case is to be determined, not by the common law, but by the rules of the maritime law; but that law, as was shown very clearly, we think, by Judge Brown in the case of The City of Alexandria, supra, is, in respect to the facts here presented, the same. See, also, the cases of The Queen (D. C.) 40 Fed. 694; The Frank and Willie (D. C.) 45 Fed. 494; The City of Norwalk (D. C.) 55 Fed. 98; Steamship Co. v. Merchant, 133 U. S. 375, 10 Sup. Ct. 397, 33 L. Ed. 656."

What was decided here in the case of Olson v. Oregon Coal & Navigation Co. is equally applicable to the improper use of a hawser upon a capstan instead of the bitts of a steamer, and, if proven as contended on behalf of the libelant in the present case, would be but the negligence of · the master in the ordinary navigation of the ship, in which the two were fellow servants. This view renders it unnecessary to determine any other question argued by counsel. For the reasons stated, we feel obliged to reverse the judgment, grievous and permanent as the libelant's injuries undoubtedly were.

The judgment is reversed, and the cause remanded to the court below with directions to dismiss the libel at the libelant's cost.