### KEENAN v. ARABIAN AMERICAN OIL CO. et al.
### No. 11088.

United States District Court
E. D. Pennsylvania.
Dec. 30, 1952.

Freedman, Landy & Lorry, Philadelphia, Pa., for plaintiff.

Charles I. Thompson, Philadelphia, Pa., specially appearing for Arabian American Oil Co.

No appearance for Americana Shipping and Trading Co., S. A.

GRIM, District Judge.

### Findings of Fact.

1. Plaintiff, Catherine Keenan, of Philadelphia, Pennsylvania, is the mother and also the administratrix of a deceased seaman, Peter Keenan, who drowned in Colombo Harbor, Ceylon, the evening of July 18, 1948, while on board a derrick barge named "Haviside No. 6."

2. Defendant Arabian American Oil Company (hereinafter referred to as "Aramco"), a Delaware corporation, at all pertinent times was bareboat charterer (or owner *pro haec vice*) of the Haviside No. 6.

3. On April 16, 1948, Aramco entered into a towage agreement with defendant Americana Shipping & Trading Corporation, S. A. (hereinafter referred to as "Americana"), the owner of a tug named the "MV Protector", in which Americana agreed to tow Aramco's derrick barge by Americana's tug from San Francisco, California, to Ras Tanura, Saudi Arabia.

4. During both the negotiations leading up to the execution of the towage agreement and the performance of the towage agreement, Americana was represented by the General Steamship Corporation, Ltd., of San Francisco (hereinafter referred to as "General Steamship"). General Steamship did not represent Aramco.

5. The towage agreement contained the following provision:

"Upon request of Second Party [Aramco] Owner [Americana] shall furnish and sign on Ship's Articles for the voyage San Francisco to Persian Gulf up to two qualified seamen and one qualified Engineer for the tow but the Second Party shall pay all expenses incurred by the Owner such as wages, feeding, P & I Insurance enroute and repatriation of the men so furnished, from Persian Gulf to San Francisco if required. The Second Party may, if it elects, furnish one or more of such crew. Payment of wages and repatriation of men furnished by Second Party shall be direct responsibility of Second Party."

6. General Steamship (Americana's agent) located three men for the barge, Jesse Steigleder, Richard A. LaPorte, and Peter Keenan, the decedent. These three men, in the order named, signed the Ship's Articles of the tug on April 27, 28, and

30, 1948, for the voyage from San Francisco to Ras Tanura. During the voyage the wages and allotments of these three men were at all times paid by Americana through its agent General Steamship.

7. At all pertinent times Americana was the employer of decedent Peter Keenan.

8. The tug and barge left San Francisco for Ras Tanura on May 4, 1948, and on July 11, 1948, put into Colombo Harbor, Ceylon, for repairs to the barge and were moored fast to buoys in the berthing area inside the breakwater of the harbor. On July 17, 1948, the tug temporarily departed from Colombo on a salvage trip, leaving the barge moored in the harbor, with Steigleder, LaPorte and Keenan aboard the barge.

9. On the morning of July 18, 1948, Steigleder and LaPorte left the barge and went into Colombo on business relating to the barge. Keenan, whose turn it was to be on night watch that evening, remained on the barge. George A. Koletar, who until a day or two previously had been employed on board the tug and who had signed off the tug's articles and was awaiting transportation back to the United States, came on board the barge during the day to stay there temporarily.

10. During the afternoon and early evening of July 18, 1948, Keenan and Koletar had been drinking beer together and Keenan was intoxicated at about 7:00 or 7:30 P.M. After supper Koletar assisted Keenan to his bunk and both men went to sleep.

11. When Koletar awoke, some time between 9:00 and 9:30 P.M. that same evening, he discovered that Keenan had disappeared. He searched for Keenan and discovered Keenan's body, either dead or unconscious, floating in the water about fifty feet from the barge. Koletar went inside the deck house where he obtained a life jacket, which he threw out towards Keenan. Koletar then jumped into the water and ascertained that Keenan was dead. Unable to drag Keenan's body up onto the barge because of Keenan's weight and the height of the barge, Koletar left Keenan's body and climbed back on the barge in order to put

a ladder over the side. Between thirty and forty-five minutes elapsed before he located and rigged up a ladder. At that time with the aid of a flashlight he saw Keenan's body still afloat in the water. He attracted the attention of native crew members on another barge moored nearby, requesting them to bring a boat over. Instead, the natives rowed ashore and summoned the harbor police, who came out and picked up Keenan's body.

12. The deck of the barge outside the deck house was six feet wide on the port and starboard sides of the deck house and was six feet nine and one-half inches wide aft of the deck house. At the time of the accident the deck on the port and starboard sides of the deck house was completely clear of obstructions. The deck aft of the deck house (stern deck) was clear of obstructions except for two anchors, one toward the port side and one toward starboard, five coils of unused portions of mooring hawsers coiled in coils two feet in diameter and ten inches high, two of which were located at each corner of the stern end of the deck and bollards and bits located about two feet inboard from the stern end of the deck. Except for the anchors there were approximately four feet of clear passage on and across the deck aft of the deck house.

13. The port, starboard, and stern decks surrounding the deck house were in a shipshape and seaworthy condition at the time of the accident.

14. The Haviside No. 6, being a derrick barge of the harbor type, was not provided with a permanent railing along the edge of the deck. A temporary rope-and-stanchion railing around the after edges of the deck had been constructed and maintained on the barge on the voyage from San Francisco to Colombo Harbor, Ceylon. Upon reaching Colombo Harbor, the men on the barge found it necessary to take down the temporary railing in order to run the hawsers out and, after mooring the barge, found it impractical to, and therefore did not, re-erect the temporary railing, because if they had done so the leads of the hawsers would have interfered with the stanchions and torn them down.

15. There was no permanent grab rail or temporary grab line along the outside of the deck house and no life line along the edges of the after deck at the time of Keenan's death.

16. While the barge was moored in Colombo Harbor, no necessity existed for a permanent railing, a temporary railing, a life line, a grab rail, or a grab line. Therefore, the absence of such lines or railings did not create an unseaworthy or negligent condition on the barge at the time of Keenan's death.

17. Life saving equipment on the barge at the time of the accident consisted of two life rings on the after housing of the living quarters, a knotted man rope about eight feet long tied to the port quarter chock on the stern and extending down into the water two feet below the surface of the water, five life jackets, one kept by each of the three men in the living quarters and two stowed in the engine room, a life doughnut raft, about five feet long and three feet wide, with a paddle inside it, kept on the after end and center of the top of the living quarters, which was readily accessible by a wooden ladder on the after housing of the deck house, and a life boat on the starboard side, forward of the living quarters.

18. The life saving equipment on the barge was adequate and seaworthy at the time of Keenan's death.

19. The Court is unable to ascertain from the evidence in the case the proximate cause of Keenan's leaving the barge and getting into the water, which resulted in his death by drowning.

20. The voyage upon which the defendants were engaged continued until October 24, 1948. From July 18, 1948, the date of the accident, to October 24, 1948, the estate of Peter Keenan is entitled to recover from defendant Americana the amount of $1,280, which is the amount of the wages Keenan would have earned but for the accident.

### Discussion

Although the evidence is clear that Keenan was intoxicated at 7:00 or 7:30 P.M. when he was assisted to his bunk by Koletar, and it is a proper inference that he was still under the influence of alcohol at 9:00 or 9:30 P.M. when he drowned, there is no evidence at all as to how Keenan got into the water and, specifically, no proof (at most a guess) that his intoxication was the proximate cause of his drowning.

One important consequence of Finding No. 19 is this: If Keenan's intoxication while on duty, which constitutes gross misconduct, had been found to be the proximate cause of his death, the administratrix of his estate would not be entitled to recover the wages he would have earned from the date of the accident to the end of the voyage. The City of Alexandria, S.D.N.Y. 1893, 17 F. 390, 395.

Under the towage agreement (See Finding No. 5) defendant Aramco is obligated to reimburse defendant Americana for all wages paid by Americana to its employees (Keenan and two others) working on Aramco's barge during the voyage in question. It follows that Aramco will also be obligated to reimburse Americana for its payment to Keenan's estate of the amount of wages Keenan would have earned from the date of his death to the end of the voyage. However, Americana, being Keenan's employer (See Findings Nos. 4, 5, 6 & 7), is directly liable to Keenan's estate for these wages. Americana has not filed a cross-claim against Aramco for the amount of the wages for which Americana will be entitled to reimbursement under the towage agreement.

### Conclusions of Law.

1. This court has jurisdiction over the parties and the subject matter of this case.

2. Defendant Americana at all pertinent times was the employer of Peter Keenan.

3. There was no negligence on the part of defendant Americana, and the Haviside Barge No. 6 was seaworthy, with respect to the condition of the port, starboard, and stern decks surrounding the deck house at the time of Keenan's death.

4. There was no negligence on the part of defendant Americana, and the Haviside Barge No. 6 was seaworthy, with respect to the absence of a permanent or temporary

railing, grab rails or grab lines, or a life line at the time of Keenan's death.

5. There was no negligence on the part of defendant Americana, and the Haviside Barge No. 6 was seaworthy, with respect to the location and condition of the life-saving equipment thereon at the time of Keenan's death.

6. Plaintiff has failed to sustain her burden of proving the proximate cause of Keenan's death.

7. Defendant Americana has failed to sustain the burden of proving its affirmative defense that Keenan's intoxication was the proximate cause of his death.

8. Defendant Americana is liable to plaintiff in the amount of $1,280 for wages the decedent Peter Keenan would have earned from the time of his death to the end of the voyage.

9. Defendant Aramco is not liable to plaintiff.

10. Judgment may be entered in favor of plaintiff and against defendant Americana in the amount of $1,280, and in favor of defendant Aramco and against plaintiff.